# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1183 | **DATE** | 9/23/2003 |
| **CASE TITLE** | Incredible Technology vs. Virtual Technologies | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Having concluded that IT cannot show any likelihood of success on the merits of its trade dress and copyright infringement claims, the Court denies IT's motion for a preliminary injunction (2-1). Because the disputed deposition testimony of Dale Crowley played no role in the resolution of this motion, GVR's motion in opposition to the designation of that testimony is denied as moot. The case is set for a status hearing on 10/30/03 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 2 4 2003 | 68 |
| ✓ | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

INCREDIBLE TECHNOLOGIES, INC.,     )
                                    )
          vs.                )     Case No. 03 C 1183    **DOCKETED**
                                    )                                  **SEP 2 4 2003**
VIRTUAL TECHNOLOGIES, INC.     )
d/b/a GLOBAL VR,               )

## MEMORANDUM OPINION AND ORDER

Incredible Technologies (IT), creator and manufacturer of the popular coin-operated

video golf game "Golden Tee Fore!," has sued Global VR (GVR), makers of the competing

"PGA Tour Golf" arcade game, for copyright and trade dress infringement. IT has moved for a

preliminary injunction, seeking an order barring GVR from distributing its game pending the

outcome of the case. This constitutes the Court's findings of fact and conclusions of law

pursuant to Federal Rule of Civil Procedure 52(a).

### Facts and Procedural History

IT, a video game design company based in Arlington Heights, Illinois, manufactures and

sells a coin operated video golf game called Golden Tee. IT created and introduced Golden Tee

in 1989. In 1995, it introduced a dedicated cabinet for the game. Since that time, IT has sold

nearly 40,000 games in that cabinet. Though IT also sells a version of the game that can be

installed in other arcade game cabinets, the dedicated-cabinet game is its principal product. IT

spends significant resources advertising Golden Tee depicted in the dedicated cabinet, some $7

million in the last four years. The game has been a runaway success, enabling IT to capture the

lion's share of the market for coin operated video golf games.

In February 2000, IT began selling Golden Tee Fore!, a revised version of the original



game that, by IT's description, "mimics certain features of the game of golf in a computer generated simulated three-dimensional environment."[1] The game consists of a software program that projects images and corresponding sounds through a video screen and speakers mounted onto a kiosk-type display cabinet. Players control the swing of a virtual golfer and navigate through various game options by pressing buttons and rotating a trackball fixed in the center of a waist-high control panel attached to the game cabinet in front of the video screen. IT claims copyright protection over the game's images and sounds, as well as its control panel and display cabinet. IT registered copyrights in Golden Tee Fore! and two subsequent versions (Golden Tee Fore! 2002 and Golden Tee Fore! 2003) in late January 2003, shortly before filing this suit. In May 2003, after the lawsuit was filed, IT obtained registrations for its copyrights in the predecessor works and supplemented one of its previous registrations. It is undisputed that IT deposited with the Copyright Office the proper materials necessary for registration of a multimedia work.

GVR is a video game design company based in San Jose, California. In 2001, GVR decided to make a coin operated video golf game to compete with Golden Tee. GVR began selling its game, PGA Tour Golf, in 2002. Like Golden Tee, PGA Tour Golf, is operated by means of a trackball and buttons installed on a control panel mounted onto a kiosk-type game cabinet facing a video screen. As with Golden Tee, PGA Tour Golf players scroll through various game options using the trackball and control a virtual golfer's swing by pulling the trackball toward the player and then spinning it forward, employing force commensurate with the

---

[1] Between 1995 and 2000, IT sold an earlier revised version of the game, called Golden Tee 3D. Neither the 1989 original version nor Golden Tee 3D are at issue in this case.

distance they want the virtual golf ball the travel.

GVR began developing the game in 2001 after obtaining from EA Sports, a leading maker of video sports games, a license to use EA's existing software (including golf courses and player images) from EA's golf game for personal computers, Tiger Woods Golf. The source code used to control Tiger Woods Golf was used as the basis for PGA Tour Golf. EA also required GVR to follow its "style guide" to ensure that the finished product was recognizable as an EA product using its colors, logos, and certain design features. EA monitored the development process for PGA Tour Golf and had ultimate veto power over the design of the game.

In developing PGA Tour Golf, GVR recognized Golden Tee's burgeoning popularity. It determined to create a game that was similar enough to Golden Tee so that players of that game could switch to PGA Tour Golf with little difficulty. To this end, GVR obtained a Golden Tee game in a dedicated cabinet and delivered the game to NuvoStudios, the firm GVR had hired to develop its game. GVR also obtained photographs of Golden Tee's control panel and likewise sent them to Nuvo. GVR instructed Nuvo to design a game that "dropped into a Golden Tee box to work with its controls, which should correspond as closely as possible to Golden Tee, so that a Golden Tee player could step up and play [GVR's game] with no learning curve." Pl's Ex. 15C, p. 7. Nuvo adhered to this directive during the time that it worked for GVR to design the game, and EA did nothing through its oversight of the development process to alter GVR's goal.

Nuvo worked from the existing Tiger Woods Golf software and made modifications necessary to convert it from a PC game operated with a mouse to an arcade game operated with buttons and a trackball. Nuvo essentially copied, with some stylistic changes, the layout of

3

buttons and instructions on Golden Tee's control panel. GVR eventually terminated Nuvo's services before it had completed work on the game. But GVR hired key Nuvo personnel to finish the job, and development continued along a path similar to that which Nuvo had followed. These personnel continued to have access to a Golden Tee game after their employment by GVR. Though the software code for PGA Tour Golf was entirely re-engineered after Nuvo's termination, the overall look and feel of the game did not change significantly. It is a fair inference that the goal of designing a game that would allow easy conversion of Golden Tee players remained the order of the day even after Nuvo was terminated.

In addition, the game selection and shot selection choices that must be made by a PGA Tour player, as well as sequence of their selection, bear significant similarities to those made by a player of Golden Tee. The two games also include a number of common features and depictions, such as club selection, an overhead map of the hole being played, display of the slope of the green, a wind meter, scorecards, leader boards, and awards for certain types of successful shots. Most or all of these elements were and are in the Tiger Woods PC game. Their depiction in the PGA Tour Golf game, however, differs significantly from that of the PC game, and bears significant similarities to their depiction in Golden Tee.

There are marked similarities between Golden Tee's control panel and that of PGA Tour Golf. To be sure, each game uses a different color scheme, and the wording on PGA Tour Golf's panel differs slightly from that on Golden Tee. But the size and shape of PGA Tour Golf's control panel, and the placement of its track ball and buttons, are nearly identical to those of Golden Tee. *See* Appendix A and B. The same "shot shaping" choices, depicted virtually the same way and in the same sequence, are present on both games. IT established that this was no

4

accident; as noted earlier, GVR wanted to win over Golden Tee players, and it set out to make it relatively simple for them to play PGA Tour. Designing PGA Tour's control panel to make it as close as possible to Golden Tee's was the best way to accomplish this result, and that is essentially what GVR did. The effort appears to have succeeded. The hearing exhibits included working copies of both Golden Tee Fore! 2003 and PGA Tour Golf's 2003 edition, and these were left in the courtroom after the conclusion of the hearing so that the Court could, if necessary, examine the exhibits and play the games (both parties consented to this). The Court's own experience was that the shot planning and shot making skills that one develops by playing each game were largely transferrable to the other.[2]

One of the important aspects of Golden Tee is the ability to control the flight of a shot by changing the movement of the trackball. As noted earlier, the player first pulls the trackball toward him– representing the "backswing"–and then pushes it forward– representing the downward swing to the ball and the follow through. Depending on the directions in which the player pulls and pushes the trackball, the player can simulate a straight shot, a fade, a slice, a draw, a hook, and various other shots. The conversion of the movement of the trackball to a particular shot is accomplished by Golden Tee's software. The relationship between particular movements and particular shots was not developed with the intention to simulate any aspects of an actual golf swing.

PGA Tour uses the same trackball-movement-to-shot conversion as Golden Tee, though

---

[2] In the interest of full disclosure, there was one notable exception. At the Court's relatively unskilled level of play, success in putting seemed much easier to achieve on PGA Tour Golf than on Golden Tee, though this may be attributable in significant part to the latter game's use of "fantasy" courses with greens much trickier than those used on PGA Tour's "real" courses.

it is undisputed that PGA Tour's software is not similar to Golden Tee's. Aaron Baker, who developed the software for PGA Tour, testified that the trackball's directional movements were meant to simulate aspects of a real golf swing. But the Court did not find his testimony credible in this regard and does not believe that GVR adopted its set of trackball movements–which "coincidentally" are the same as Golden Tee's–with an eye to simulating any aspect of real golf. Rather, the Court believes that GVR determined to use this particular set of trackball-movement-to-shot conversions as part of its goal of making it easy for Golden Tee players to switch to PGA Tour Golf. Thomas Kostos, an expert player of both games as well as a "scratch" golfer (i.e. one who consistently shoots par or better), testified at the preliminary injunction hearing and gave a credible rendition of how the movements of the trackball might be thought to resemble aspects of the actual swing of a golf club. But Mr. Kostos was not directly involved in the development of PGA Tour Golf, and GVR's presentation of his testimony on this point amounted to an after-the-fact rationalization of a process that, the Court finds, was developed with a different goal in mind.

The two games do, however, have important and significant differences. Golden Tee employs "fantasy" golf courses and, as with most arcade games, the player is given a generic title ("Player 1," Player 2," etc.) when playing the game. By contrast, PGA Tour Golf, like the Tiger Woods Golf PC game, uses depictions of real golf courses such as Pebble Beach and TPC Sawgrass, and the game permits (but does not require) the player to adopt the identity of selected "real" professional golfers such as Colin Montgomerie and Vijay Singh. PGA Tour also includes a number of shotmaking options not available in Golden Tee.

There is also a noticeable difference in the way the two games appear to a prospective

6

player as he or she approaches the game. Though Golden Tee contends that the shape of PGA Tour's cabinet is a virtual knock-off of Golden Tee's, such is not the case. The side panels of Golden Tee's cabinet are long with sharp curves; the panel roughly approximates the shape of the State of California. *See* Appendix C. PGA Tour's side panels are wider with less dramatic curves; the panel roughly approximates the shape of the State of Nevada. *See* Appendix D. Both games have marquees with the appearance of what used to be called a neon sign, but they use markedly different color schemes, and the respective games' titles are prominently featured. *See* Appendix E and F. PGA Tour Golf also prominently depicts EA Sports' name and logo, a feature obviously not present on Golden Tee. As a player approaches a PGA Tour game, it would be difficult, if not virtually impossible, for him or her to confuse it with the Golden Tee game.

On February 18, 2003, IT filed suit in this Court against GVR, alleging copyright and trade dress infringement. It alleged that GVR created PGA Tour by copying the "shapes, sizes, sequences, configurations, forms, patterns, dimensions, contents, supporting documentation, manuals, physical cabinet, player perspective and arrangements as well as the look, play and feel of Golden Tee Fore!." Complaint at ¶ 32. It further alleged that GVR sought to create confusion in the marketplace, selling its game with "the hope and expectation that persons seeking to buy [Golden Tee] would buy and/or play [PGA Tour] instead and by mistake." *Id.* at ¶ 40.

Upon filing its complaint, IT moved for a temporary restraining order and preliminary injunction, seeking to bar GVR from marketing or selling its game pending the resolution of the case. After a hearing on February 25, 2003, the Court denied the request for a TRO. The parties then conducted expedited discovery, and on August 4, 2003, we began a six day evidentiary

hearing on IT's motion for a preliminary injunction. The evidence presented at the hearing included still photographs and video recordings of in-game images from both the Golden Tee and PGA Tour games, as well as full-size arcade versions of each game furnished to the Court for purposes of comparison. The Court also heard testimony from a number of witnesses, including the creators of both games, and the aforementioned Mr. Kostos, who has earned prize money playing both plaintiff's and defendant's games professionally.

## Discussion

To obtain a preliminary injunction, IT must demonstrate (1) some likelihood that it will prevail on the merits of its trade dress or copyright claims, (2) absence of an adequate remedy at law, and (3) that it will suffer irreparable harm without injunctive relief. *Publications Int'l v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir. 1996). If these threshold requirements are met, the court balances the irreparable harm to IT against the harm that would be suffered by GVR if injunctive relief were granted. *Id.*; *see also JCW Investments, Inc. v. Novelty, Inc.*, 222 F. Supp. 2d 1030, 1033 (N.D. Ill. 2002). Most of the evidence presented during the hearing and the arguments raised in the parties' post-hearing briefs concerns the merits of IT's intellectual property claims. We address that issue first; if IT cannot show at least some probability of success on the merits of its copyright or trade dress claims, an injunction is inappropriate, and we need not address the issues of irreparable harm and absence of an inadequate remedy at law. *See Abbot Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (if a party moving for a preliminary injunction cannot demonstrate a likelihood of success on the merits, the court's inquiry is over and the injunction must be denied).

1.     Copyright Infringement

To establish copyright infringement, IT must prove its ownership of a valid copyright, and copying of the protected work by GVR. *Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 614 (7th Cir. 1982). On the latter point, IT need not produce direct evidence of copying, but it must show that GVR had access to Golden Tee and that PGA Tour is substantially similar. *Id.* The question is whether a reasonable person would conclude that GVR unlawfully appropriated copyrightable expressions embodied in IT's work, an inquiry which depends on whether PGA Tour can be said to capture the "total concept and feel" of those expressions. *Id.*

The parties agree that IT has a valid registered copyright in Golden Tee Fore! and in the succeeding versions of the game, Golden Tee Fore! 2002 and Golden Tee Fore! 2003. But they disagree about the scope of protection that IT's copyright registration provides. Prior to filing its suit, IT submitted two separate certificates of registration with the Copyright Office, one (Form TX) claiming copyright protection over Golden Tee as a "nondramatic literary work" and asserting a copyright in the "entire work," and the other (Form PA) asserting a copyright in Golden Tee as an "audiovisual work." Complaint, Ex. 4. In its briefs, IT insists that its copyright extends to "the overall appearance and aesthetic appeal of Golden Tee," including features of the game cabinet and control panel. IT's Reply Mem. at 15; *see also* Complaint, ¶ 32 (claiming protection over the "manuals, physical cabinet ... as well as the look, play and feel of Golden Tee Fore!"); IT's Infringement Chart at 2-10 (claiming protection over the "overall appearance and expression" embodied in the control panel and cabinet, and identifying as copyrighted features of the work, the main cabinet, "side swoosh," trackball size and color, and swing guide instructions). GVR disputes the claimed breadth of IT's copyright. It argues that

9

video games like Golden Tee (or PGA Tour) are copyrightable only as "audiovisual works," *see* 17 U.S.C. §§ 101, 102(6), and are protected only as a "distinctive set of images and sounds." *See Midway Mfg. Co. v. Arctic Int'l, Inc.*, 704 F.2d 1009, 1012 (7th Cir. 1983) (video games, defined as distinctive sets of images and sounds stored in circuit boards, are copyrightable as audiovisual works under the 1976 Copyright Act). Consequently, GVR argues, the game cabinet and control panel should be excluded from the Court's copyright infringement analysis.

The Court is not persuaded that IT's copyright in Golden Tee is limited to the game's images and sounds. It is clear that video games are copyrightable as "audiovisual works," as that term is defined in the Copyright Act. *See* 17 U.S.C. § 101 ("Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the work is embodied."); *see also Midway*, 704 F.2d at 1012; *Atari,* 672 F.2d at 617; *Data East USA, Inc. v. Epyx Inc.*, 862 F.2d 204, 206 (9th Cir. 1988). It is far from clear, however, whether video game arcade units, comprised of video game software as well as expressive cabinetry and controls, are copyrightable *only* as audiovisual works. Neither of the cases GVR cites (*Midway*; *Williams Electronics, Inc. v. Arctic International, Inc.*, 685 F.2d 870 (3rd Cir. 1982)) supports its position. In *Midway*, the Seventh Circuit decided that video games are copyrightable as audiovisual works and that the plaintiff's games, "Pac-Man" and "Galaxian," were subject to copyright protection. *Midway*, 704 F.2d at 1012. But the plaintiff's infringement claim was limited to the images and sounds stored in the games' circuit boards, *see id.*, and the court took no position as to whether the Pac-Man or Galaxian game cabinets or

10

controls were protected. Similarly, in *Arctic International*, the Third Circuit decided that the audiovisual features of the plaintiff's "Defender" game were copyrightable, but did not explore the possibility of copyright protection over the structure in which the game was housed. *Arctic International*, 685 F.2d at 874-75.

The Court is willing to assume for purposes of deciding the present motion that IT's copyright registration was intended to cover Golden Tee's video game, cabinet and control panels–all as components of a multimedia work–and that in principle, an author might claim copyright protection over an original arcade game in this way. *See, e.g., Williams Electronics, Inc. v. Bally Manufacturing Corp.*, 568 F. Supp. 1274, 1278-81 (N.D. Ill. 1983) (considering claim that the physical features of a pinball machine are copyrightable as "pictorial graphic or sculptural works" under 17 U.S.C. § 102(a)(5)). But IT cannot simply argue that GVR has appropriated the "total concept and feel" of Golden Tee as a whole. Rather, it must identify particular copyrightable expressions on the cabinet and control panel, along with original images and sounds in the game, and must prove that GVR copied those expressions in creating PGA Tour. *See Atari*, 672 F.2d at 614 (ordinary observer test in application must take into account that copyright laws preclude appropriation of only those elements of the work that are protected by copyright). Thus, before considering the question of copying (substantial similarity), we must break down IT's game into its copyrightable and noncopyrightable elements, comparing only the protected elements of Golden Tee to the analogous elements in PGA Tour. *Id.*; *Bally Manufacturing*, 568 F.Supp. at 1281-82.

    a. Copyrightability

    i. "Dedicated" Cabinet

IT asserts that the "dedicated" cabinet in which most of the Golden Tee Fore! games are sold, *see* Tr. 17:14-17, 145:20-24, is copyrightable. It does not, however, explain how the cabinet is protected under the Copyright Act. To provide some description, the dedicated cabinet is fairly typical of arcade cabinets generally: it is roughly 6 feet tall and 3 and ½ feet wide, composed of plastic, wood and metal paneling, and features a video screen and controls and a coin slot through which a player inserts quarters to start the game. Pl's Ex. 3A.

IT argues that certain features of the cabinet are original and distinctive, including its white, wooden, curved side panel (which IT refers to as a "side swoosh") extending from the top of the cabinet to its base, a backlit marquee above the video screen, and an LED screen perched on top of the cabinet advertising the "Tournament Play" feature of the game. But it falls short of identifying how any of these elements are copyrightable, arguing instead that the cabinet, "with all its expressions" is part of a "'tapestry of expression that weaves itself into being an entertainment product that is unique and recognized worldwide.'" IT's Reply at 12.

The most plausible source of copyright protection for Golden Tee's cabinet is 17 U.S.C. § 102(a)(5), which describes as copyrightable "pictorial, graphic and sculptural" works, including three dimensional works of applied art. But IT expressly rejects the argument that its cabinet or control panel is a sculptural work. IT's Post-Hearing Brief at 15-16. In any event, the cabinet is ineligible for protection, as GVR argues, because it is a useful article: it houses Golden Tee's video screen, speakers, and controls. *See Durham Industries Inc. v. Tomy Corp.*, 630 F.2d 905 (mechanical, utilitarian aspects of games, including their physical shapes and dimensions are not copyrightable); *Bally Manufacturing*, 568 F.Supp. at 1280 (physical components of a pinball game, including shape and placement of targets, are utilitarian and noncopyrightable). Though

12

certain of its features–the Golden Tee logo, the graphics on the marquee–could be considered separable from the cabinet, *see* 17 U.S.C. § 102(a)(5)(useful articles excluded from copyright protection generally); *but see* House Rep. No. 94-1476, 94th Cong., 2d Sess. 55 (1976), *reprinted in* 1976 U.S.C.C.A A.N. 5659, 5658 (design features that can be identified separately from the utilitarian aspects of a useful article, like a carving on the back of chair or a floral relief design on a silver fork, are copyrightable), IT does not argue that these particular features have been copied, and a quick comparison of the two games reveals that GVR's game sports its own logos and marquee graphics.[3] We conclude, therefore, that the Golden Tee "dedicated" cabinet is not copyrightable and must be excluded from our infringement analysis.

ii. Control Panel

Golden Tee's control panel is attached to the game cabinet in front of the video screen. It is about 30 inches wide and 3 feet from the floor, and it juts out from the video screen a fair distance, allowing a player to apply a great deal of force to the trackball (as one is required to do to play the game) without striking his or her hand against the protective glass covering the video screen. As we have noted, the center of the control panel features a white trackball, 2½ inches wide, flanked by a series of red and white buttons (3 on the left and 2 on the right) which control various game functions. The trackball is immediately surrounded by six gold-colored arrows labeled A, B, C, 1, 2, and 3 and two additional gold arrows, each of which is labeled "Choose Club." Labels above and below the trackball indicate that rolling the trackball back towards arrows A, B, and C allows the player to control the virtual golfer's backswing, and that rotating the trackball forward towards arrows 1, 2 and 3 allows the player to direct the virtual golfer's

---

[3] In any event, as noted earlier, the two cabinets' shapes are not as similar as IT contends.

forward swing. At the top of the control panel is an instruction chart containing graphic depictions of the nine different combinations of forward and backward movement of the trackball that will result in the nine possible flight patterns that a player can direct the virtual golf ball to take. The chart contains nine boxes, each of which features two miniature gold arrows (for example, arrows A and 1) depicting possible forward and backward movement of the trackball, and a small white arrow depicting the corresponding flight of the virtual golf ball. The control panel also features a box with written instructions on how to operate the trackball, as well as a small warning label advising that using excessive force in operating the trackball could result in injury.

IT asserts copyright protection in the control panel and its component features. It argues that the graphics and text describing how to operate the game, and in particular, how to create a virtual golf swing using the trackball and buttons, are original, protected expressions. It also asserts a copyright in the layout of the control panel: its curved design, its width and height, and the color and placement of the trackball, buttons, and instructions. IT's Infringement Chart at 3-10. GVR disputes this claim, arguing that the control panel, like the cabinet, is a useful article ineligible for copyright protection, and that the layout of the trackball and buttons was driven by utilitarian considerations. GVR also argues that, to the extent that graphics on the control panel are original expressions, they contribute to the control panel's usefulness and, along with the trackball and buttons, comprise a non-copyrightable "method of operation." *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such

14

work").

It is clear that the trackball and buttons themselves are not copyrightable–whether because they are part of a non-copyrightable "method of operation," *see Lotus Development Corp. v. Borland International Inc.*, 49 F.3d 807, 815-819 (2nd Cir. 1995) (explaining that a "method of operation" as the term is used in § 102(b) is the "means by which a person operates something" and holding that a computer menu command hierarchy, like buttons on a VCR, are non-copyrightable), or because they constitute mechanical, utilitarian aspects of a creative work. *See Durham*, 630 F.2d at 915 (levers and buttons are non-copyrightable mechanisms that make games work); *Bally*, 568 F.Supp. at 1274. The question is whether the layout of the buttons or the instructions and graphics explaining how to use them are creative expressions eligible for protection under the Copyright Act.

The Court agrees with GVR that like the trackball and buttons, the layout of these features, and the instructions and graphics on the control panel are closely related to a potentially patentable–but not copyrightable–process for operating a video game. Golden Tee's controls, the way in which they are organized, and the instructions for how to use them, are all incidents of a sophisticated system (which IT apparently invented) that allows a player to play a simulated game of golf. This does not mean, as GVR contends, that the organization of the buttons and the instructions and graphics are necessarily uncopyrightable. *See Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1372 (10th Cir. 1997) (Section 102(b) does not extinguish the protection accorded a particular expression of an idea merely because that idea is embodied in a method of operation at a higher level of abstraction); *Lotus*, 49 F.3d at 815 (distinguishing between buttons, as uncopyrightable methods of operation, and labels on buttons, which merely make operation

15

easier); *see also American Dental Association* v. *Delta Dental Plans Association*, 126 F.3d 977, 981 (7th Cir. 1997) (stating that instructions for filling out an uncopyrightable blank form are copyrightable). But "where a particular expression is common to the treatment of a particular idea, process or discovery, it is lacking in the originality that is the *sine qua non* for copyright protection." *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 838 (10th Cir. 1993)(citing *Feist Publications v. Rural Telephone Service Co.*, 499 U.S. 340, 348 (1991)). Moreover, expression dictated by factors external to the author's creativity is excluded from copyright protection. *See Mitel*, 124 F.3d at 1375 (expression dictated by factors external to author's creativity is excluded from copyright protection, securing for public use the "'necessary incidents' of ideas and processes" (citing *Computer Associates International v. Altai, Inc.*, 982 F.2d 693, 711 (2nd Cir. 1992))). IT must show that the expressions on the control panel over which it claims protection were dictated by its own creativity and that they flow from some consideration other than providing a simple explanation for how Golden Tee's trackball system works.

IT has offered some evidence in support of its claim of creativity. It has submitted twelve separate, alternative designs for a control panel, each of which, it asserts, would effectively explain to a player how to operate Golden Tee's trackball system. IT's Reply, Ex. C. Though similar to Golden Tee's control panel, each of these alternative designs employs somewhat different graphics and labels to explain how the system works. *Id.* These alternative designs arguably show that there is more than one way to describe how the trackball system works and that the particular manner in which IT designed its control panel is not strictly necessary to Golden Tee's method of operation. But there is no evidence in the record to suggest that IT

16

considered anything other than how best to explain its trackball system when it designed the text and instructional graphics featured on Golden Tee. *See Dun & Bradstreet Software Services Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 215 (2nd Cir. 2002) (in determining whether computer program commands were copyrightable, question was whether external factors limited the expressive choices available to the author, not whether external factors limited the choices available to the alleged infringer). The same is true of the layout of the buttons, which appear to have been placed where they are for purposes of convenience and cannot fairly be characterized as expressive.

Even if the graphics, instructions, and layout of the control panel were copyrightable, these elements would not be subject to a significant degree of protection. Assuming that IT's shot creation chart and its system of numbers, letters, and arrows add something expressive or creative beyond representing the idea that certain golf shots can be produced by certain combinations of forward and backward trackball rotations, the additional element of creativity is slight, and can be protected only against virtually identical copying. *See Atari*, 672 F.2d at 616-617 (when expression adds little new or additional over an idea, it falls towards one end of the spectrum of copyright protection, and merits little protection).

iii.  Video Images

IT next asserts a copyright in Golden Tee's video game imagery. GVR does not dispute that the look and feel of the imagery of a video arcade game may be copyrightable. It argues, however, that many of the elements over which IT claims protection are really generic expressions–scenes a faire–common to or inherent in the idea of video golf, or common to creation of coin operated video games generally. *See Atari*, 672 F.2d at 616 ("Scenes a faire

17

refs to 'incidents, characters or settings which are as a practical matter indispensable, or at least standard in the treatment of a given topic'" (quoting *Alexander v. Haley*, 460 F.Supp. 40, 45 (S.D.N.Y. 1978))). For instance, IT claims that GVR has copied from Golden Tee the placement of certain expressions on the screen: the "non-moveability feature" of a top-down map showing the layout of the virtual golf course, a dynamic yardage indicator, a wind meter, a feature showing the slope of the green information, and a pointer showing the distance that a ball can travel with a particular club. Infringement Chart at 10-19; IT's Post-Hearing Mem. at 7. It also asserts copyright protection in game play– the overall "look, feel, structure, sequence, and organization" of the game. IT's Infringement Chart at 19. According to IT, this includes the features of a leader board showing the progress of the player and his competitors through a round of golf, and the fact that it appears at the end of each hole; the features of a scorecard recording a player's strokes; the sequence and timing of screens that allow a player to enter his initials after a long putt or successful drive; a trophy screen and text reading "Great Shot" that appears when a player hits shots a certain distance from the hole; text prompts asking a player if he wants to quit the game, and if he wants to buy a "Mulligan" to retake a shot; and the content and sequence of menu screens that ask a player to select a particular virtual golf course, the desired number of players, the type of play (for example, stroke play or "skins" play) and the length of the game.

We agree with GVR that many of these elements of Golden Tee are standard or common to the theme of golf or to the creation of a coin-operated video game, and are thus copyrightable only to a limited extent and only in "the particular forms in which they are expressed." *Atari*, 672 F.2d at 617. The wind meter and club selection features, for example, account for variables in a real game of golf and are indispensable to an accurate video representation of the sport. The

game selection features, such as the menu screens and player quit options, are standard to the video arcade game format, as is the fixed placement of certain icons around the border of the screen—for instance, "the non-moveability feature," as IT calls it, of the course map showing the virtual golfer's distance to the hole. Though these elements are protected at least in their "shapes, sizes, colors, sequences, and arrangements," like the graphics on the control panel, they are to be treated as scenes a faire, and are afforded protection only from virtually identical copying. *Id.*

b. Copying

During the evidentiary hearing, IT introduced some evidence regarding the circumstances of PGA Tour's creation, including some direct evidence of copying by GVR. But IT's infringement claim is primarily based on an inference of copying drawn from GVR's access to Golden Tee and the alleged substantial similarities between the two games. As we have discussed, IT's copyright in Golden Tee is narrower than it asserts. Its infringement claim is correspondingly limited. In assessing whether GVR copied Golden Tee, we may only consider substantial similarities between copyrightable elements of IT's work and the analogous components of PGA Tour. The test for determining substantial similarity involves two separate inquiries: whether the defendant copied the work, and whether the copying, if proven, went so far as to constitute an improper appropriation. *Atari*, 672 F.2d at 614. To the extent we have determined that a particular copyrightable element of Golden Tee is subject only to slight protection, a showing of nearly identical copying is required. *Id.* at 616-617. Having concluded that the cabinet is not subject to copyright protection, we begin our analysis with the control panel.

Assuming that the numbering and lettering graphics, IT's shot creation chart, and the textual instructions on the control panel offer any expression other than that necessary to explain the Golden Tee trackball system, the protection to be afforded these elements is limited. To find infringement, the Court would need to conclude that GVR's control panel is nearly identical. We cannot. On a basic level, the two games' control panels bear striking resemblance. Each has the same number of arrows surrounding the trackball, labeled A, B, C, 1, 2, and 3, and each has a chart across the top of the panel (which GVR labels "Shot Shaping") showing the nine different combinations of trackball rotations that can be used to create virtual golf shots. As with Golden Tee, PGA Tour's control panel features a box with textual instructions on the bottom right hand side. The buttons on the control panels are also laid out in the same format, and there was evidence introduced during the hearing that showed that the buttons and trackball on each game were laid out exactly the same distance apart.

But there are important stylistic differences between the control panels that, given the slight protection arguably available to IT's expressions, precludes a finding of infringement. For example, GVR's control panel employs an entirely different color scheme, one that the evidence shows is consistent with requirements imposed by EA Sports, the software manufacturer that commissioned GVR to create an arcade version of its PGA Tour game for personal computers. Whereas Golden Tee's control panel is deep blue with gold arrows, gold lettering and red borders, PGA Tour's panel is light blue and silver with red and blue arrows, black and white lettering, and silver borders. The arrows surrounding PGA Tour's trackball are larger than those featured on the Golden Tee panel, and the PGA Tour trackball appears surrounded by a large graphic depiction of a golf ball. Though the graphic instruction chart on each panel is located in

20

the same place, Golden Tee's chart consists of one long, rectangular, evenly divided row of columns imposed against a blue background. PGA Tour's "Shot Shaping" chart appears as though affixed to a long, curved metallic panel. PGA Tour's panel is also covered with references to its brand name, and it prominently features the GVR logo and EA Sports logo.

Were all of its graphic expressions entitled to the same high level of protection as the fanciful "gobbler" and "ghost monster" characters in Pac-Man, *see Atari*, 672 F.2d at 618, the generally similar aesthetic appeals of the control panels would be determinative. But the shared overall look and feel of the control panels in this case owes itself to the fact that GVR has chosen to use the same unpatented, non-copyrightable trackball system used by Golden Tee as the method for operating its arcade game. Because GVR is entitled to use IT's unpatented method for controlling a virtual golf swing, it is likewise entitled to display instructions that convey to players in simple terms how that method works. It makes no difference that IT "invented" the Golden Tee trackball system, or was the first to describe it: "Granting copyright protection to the necessary incidents of an idea would effectively afford a monopoly to the first [person] to express those ideas." *Gates Rubber*, 9 F.3d at 838. Such a result would run contrary to § 102(b) of the Copyright Act which states that "in no case does copyright protection for an original work extend to any idea ... regardless of the form in which it is described, explained, illustrated, or embodied in such work." GVR was thus permitted to organize its control panel instructions in roughly the same manner as IT's, employing stylistic changes such as differences in color and shape and the addition of certain graphics to distinguish its product and to steer clear of infringement. And because there is no evidence that the layout of the buttons on Golden Tee is in any way expressive, GVR was allowed to organize PGA Tour's buttons in the same configuration.

We turn next to the issue of whether GVR copied any of Golden Tee's video imagery. In determining whether there are substantial similarities between the video game content in PGA Tour and Golden Tee, we must set aside elements of Golden Tee that we have decided are scenes a faire, and then ask whether PGA Tour has captured the total concept and feel of Golden Tee. *Atari*, 672 at 617-620; *see also Data East*, 862 F.2d at 208-10. Our analysis here is informed by principles applied by the Seventh Circuit in *Atari*, and by the Ninth Circuit in *Data East*, and thus a brief review of those cases is instructive.

In *Atari*, the Seventh Circuit considered whether plaintiff's copyright in its Pac-Man video game had been infringed by defendant's competing game, K.C. Munchkin. Addressing the issue of copying, the court first determined that Pac-Man was "primarily an unprotectible game," but that certain expressions in the game were copyrightable. It described Pac-Man, in abstract terms, as a "maze-chase game in which the player scores points by guiding a central figure through passageways of a maze and at the same time avoiding collision with certain opponents or pursuit figures which move independently about the maze." *Atari*, 672 F.2d at 617. The court found that "certain expressive matter in the Pac-Man work ... should be treated as scenes a faire and receive protection only from virtually identical copying." For example, it determined that the maze and scoring table, and the use of dots as means by which a player's performance can be gauged and rewarded with points were all "standard game devices." Though K.C. Munchkin's maze design, scoring table, and dots were similar to those expressions as they appeared in Pac-Man, given the lesser protection to which they were entitled, the court found them to be "sufficiently different" to preclude a finding of infringement. *Id.* On the other hand, the court determined that Pac-Man's fanciful characters, the "gobbler" and "ghost monsters," which

22

distinguished Pac-Man from conceptually similar maze games, were subject to greater copyright protection and that K.C. Munchkin's "blatantly similar" gobbler and ghost monsters supported a claim of infringement.

In *Data East*, the Ninth Circuit considered a copyright infringement claim brought by the creator of the video game "Karate Champ" against the maker of the competing game "World Karate Championship." 862 F.2d at 205. There the court observed a laundry list of similarities between the games, mostly similar video representations of martial arts combat. *Id.*, 209. Reviewing the district court's findings of fact, the court noted, for example, that each game featured two combatants capable of performing various karate moves, including forward and backward somersaults, back-foot sweeps, and jumping sidekicks. *Id.* Each game also featured a referee saying "begin," "stop," "white," "red," depicted by a cartoon-style speech balloon. *Id.* And both games featured changing background scenes, 30-second countdown rounds and one and two player options. *Id.* As in *Atari*, the court in *Data East* concluded that a certain amount of the expression in "Karate Champ" amounted to scenes a faire: "[t]hese features, which consist of the game procedure, common karate moves, the idea of background scenes, a time element, a referee, computer graphics, and bonus points, result either from constraints inherent in the sport of karate or computer restraints." *Id.* at 209. As such, the court explained, those elements of the game were subject to protection only against identical copying. *Id.* Comparing the two works, the court could not find identical copying. Because there were no additional, fanciful expressions common to the two games as in *Atari*, the court denied the plaintiff's infringement claim.

Having compared extensively the images, sequences and gameplay of Golden Tee and PGA Tour, we conclude that IT's infringement claim, as in *Data East*, is driven primarily by

23

similarities between game features that are either inherent in the sport the games depict, or dictated by the coin-operated arcade game format. As we have discussed, Golden Tee's wind meters, slope of the green information, leaderboard, scorecards, course maps and the like account for variables inherent in real golf, and the menu screens, fixed placement of icons, point reward system ("Great Shot Points"), and game selection options (selection between courses, type of play, number of players, etc.) are common elements of arcade games. Though PGA Tour shares nearly all of these features, the graphic depictions of them in PGA Tour are sufficiently different from those in Golden Tee to preclude a finding of infringement. For example, the fonts, colors and borders on the menu screens and icons differ, and PGA Tour features higher definition graphics throughout. *See* Appendix G and H.

Unlike in *Atari*, there are no fanciful expressions common to the two games. On the contrary, the original, fanciful expressions in Golden Tee are nowhere to be found in PGA Tour. Golden Tee features "fantasy courses" of its own creation, and a generic depiction of a golfer, whereas PGA Tour features meticulously rendered video simulations of real professional players and real PGA Tour golf courses. *See* Tr. 577:1-21. Furthermore, the depictions of golfers, clubs, spectators, and natural scenery all appear in greater detail and with greater definition in PGA Tour. During the evidentiary hearing and in its briefs, IT emphasized that the play of each game shared a similar overall feel. We conclude, however, that a player's overall interactive experience with the two games is similar mostly insofar as the method for operating the game is similar. Other similarities, as we have remarked, arise from elements common to video golf and to arcade games generally. Because IT has failed to demonstrate substantial similarities between *copyrightable* material in PGA Tour and Golden Tee, we find that its infringement claim has

24

little or no chance of success on the merits.

2. Trade Dress

For reasons similar to some of those discussed with reference to its copyright claim, the Court concludes that IT's trade dress claim likewise promises little success on the merits. In order to prove trade dress infringement, a plaintiff must establish that (1) its trade dress is inherently distinctive or has acquired secondary meaning; (2) the similarity of defendant's trade dress to that of the plaintiff's creates a likelihood of confusion on the part of consumers; and (3) the plaintiff's trade dress is "non-functional." *Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063, 1067-68 (7th Cir. 1992). IT argues that Golden Tee's "dedicated" cabinet and control panel constitutes protectible trade dress in that it has acquired secondary meaning. There is some support for this assertion. "'[S]econdary meaning is acquired when 'in the minds of the public, the primary significance of a product feature ... is to identify the source of the product, rather than the product itself.'" *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 658 (7th Cir. 1995) (quoting *Qualitex Co. v. Jacobson Products Co. Inc.*, 514 U.S. 159, 163 (1995); *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n.11 (1982)). During the hearing, IT personnel testified that Golden Tee has been sold mostly in the same dedicated cabinet since 1995. Tr. at 17:14-17, 145:20-21. And it introduced into evidence a Nike advertisement, and a "Saturday Night Live" skit, both featuring Golden Tee's cabinet, which arguably suggest some public association between the shape of the cabinet and the game itself. *See* Pl's Exs. 29, 62.

The problem with IT's trade dress claim, however, is that it cannot show relevant similarities between its cabinet and controls and those of PGA Tour. First, and most obviously,

IT claims trade dress protection in the "white side swoosh" on its cabinet. But PGA Tour does not have a "white side swoosh." The PGA Tour cabinet's side panels are curved like many other arcade game cabinets. But PGA Tour's side panels are blue and are emblazoned with the PGA Tour logo. Further, Golden Tee's and PGA Tour's side panels are not curved in the same way at all.[4] In any case, it would be very difficult to infer a likelihood of confusion by comparing the two cabinets. And we have previously discussed the differences in the two games' control panels.

The issue of similarity is not alone dispositive. *See Thomas & Betts*, 138 F.3d at 296 (citing *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996)) (other relevant factors include the area and manner of concurrent use, degree of care likely to be used by consumers, strength of the plaintiff's trade dress, actual confusion, intent of the defendant to pass off its product). But the issue of functionality is outcome determinative, *see Traffix Devices Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001)(trade dress protection may not be claimed for product features that are functional), and the claimed similarities between Golden Tee and PGA Tour relate entirely to functional features. A functional feature is one that is "essential to the use or purpose of the device." *Id.* As we discussed in relation to IT's copyright claim over the control panel, Golden Tee's graphic instructions, or something very close to them, are necessary to describe how the trackball, shot-shaping system works. We are not persuaded that IT can successfully discharge its burden of proving that the control panel features are non-functional.

---

[4] As we have discussed, Golden Tee's side panels are long with sharp curves and resemble the receiver on a telephone or the shape of the state of California. By contrast, PGA Tour's panels are wider with less dramatic curves and look a bit like the state of Nevada.

## Conclusion

Having concluded that IT cannot show any likelihood of success on the merits of its trade dress and copyright infringement claims, the Court denies IT's motion for a preliminary injunction [docket # 2-1]. Because the disputed deposition testimony of Dale Crowley played no role in the resolution of this motion, GVR's motion in opposition to the designation of that testimony is denied as moot. The case is set for a status hearing on October 30, 2003 at 9:30 a.m.

MATTHEW F. KENNELLY
United States District Judge

Dated: September 23, 2003

# SEE CASE FILE FOR EXHIBITS